UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation,<br><br>   Plaintiff,<br><br>   v.<br><br>JOHN P. PADERTA, an Illinois citizen,<br><br>   Defendant.<br><br>FIFTH THIRD BANK, an Ohio banking corporation,<br><br>   Intervening Defendant. | No. 10 C 406<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

### The Undisputed Facts

Fifth Third Bank ("Fifth Third") is an Ohio banking corporation with its principal place of business in Cincinnati, Ohio. Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut. John P. Paderta is a citizen of Illinois.

This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

Venue is proper in this District because the events giving rise to the claims took place within the District and Travelers is subject to personal jurisdiction in this District.

## The Events

**Krahl Fails**

Prior to January, 2010, Krahl Associates, Inc. d/b/a Krahl Construction ("Krahl") was a general contractor providing its services for public and private construction projects located throughout Illinois and Colorado.

Prior to January, 2010, Rush and NMH, two well-known Chicago medical and hospital services, each entered into various contracts with Krahl to perform improvements on their respective properties located in Chicago.

Krahl was to act as general contractor on some, but not all, of these projects. Some contracts between Rush, NMH and Krahl required Krahl to obtain performance and payment bonds ("Bonds"). Krahl engaged Travelers (as surety), to provide Bonds on behalf of Krahl (as bonded principal) for the Bonded Projects involving Rush and NMH (as project owners/bond obligees). Travelers issued payment and performance bonds ("Bonds") on behalf of Krahl for the Rush and NMH Bonded Projects.

In exchange for Travelers issuing these Bonds, Krahl and Defendant John P. Paderta entered into and executed a General Agreement of Indemnity with Travelers on or about October 26, 2007 ("Krahl Indemnity Agreement"). All of the bond and indemnity agreements are incorporated by reference in the record as are the Fifth Third loan documents.

Between May 2004 and June 2009, Fifth Third loaned in excess of $6 million to Krahl pursuant to certain Revolving Note Loan Agreements ("Loan Agreements"). By September 2002, Fifth Third filed a UCC-1 Financing Statement and Security Agreement with the Illinois Secretary of State and continued its UCC-1 coverage on new financing extended to Krahl. Travelers did not perfect a security interest under UCC but rather relied on its remedies as surety.

Around January 5, 2010, FBI agents raided Krahl's main office and obtained papers, records and computers from Krahl.

On January 6, 2010, pursuant to terms of the Loan Agreements, Fifth Third declared Krahl in default. On January 8, 2010, Fifth Third exercised its claimed legal, equitable and contractual rights of setoff with respect to the balance of funds remaining in Krahl's operating business checking account, $2,720,019. Krahl ceased doing business around the same time. Whether Krahl ceased business because of the declaration of default or for some other reason or a combination reasons is not agreed upon and the correct answer seems immaterial in the context of this motion.

Krahl, now out of business, abandoned working on, failed to complete, and defaulted on certain Bonded and Non-Bonded Projects, including failing to pay subcontractors on both Bonded Projects and Non-Bonded Projects for Rush and NMH.

On or about January 15, 2010, Krahl entered into a Trust Agreement and Assignment for the Benefit of Creditors of Krahl ("Assignment") with Howard Samuels, as Assignee. Thereafter, Krahl no longer operated.

By January 19, 2010, after asserting its claimed contractual and common law rights of setoff against the outstanding balances under the Loan Agreements, Krahl owed Fifth Third $4,252,274 and a few cents.

**After the Fall of Krahl**

Beginning in January 2010 and continuing on to the present, Travelers has received numerous performance and payment bond claims in connection with the Bonds it has issued on behalf of Krahl, including but not limited to the Rush and NMH Bonded Projects. Travelers paid out approximately $2,010,797 to discharge its obligations under the performance and payment

3

bonds it issued on RUSH Bonded Projects. Travelers also paid out approximately $1,127,604 to discharge its obligations under the performance and payment bonds it issued on NMH Bonded Work.

**RUSH Projects**

The case of the Rush contracts varies from contract to contract. On some of them Krahl secured performance and payment bonds, on others the contracts did not require Krahl to obtain such bonds from a surety. There are bonded Rush projects and Non-Bonded Rush Projects.

On or about April 21, 2010, Howard Samuels, in his capacity as Assignee for the benefit of Krahl's creditors, sued Rush in state court for amounts due on Rush projects, bonded and not bonded.

Travelers has paid out approximately $2,010,797 to discharge its obligations under the performance and payment bonds it issued on Rush Bonded Projects. These claims include but are not limited to, a performance bond claim by Rush on the Bonded Project known as the "Jelke Project." Travelers in turn has received total payments of $1,589,622 from Rush in connection with Travelers' performance on the Rush Bonded Project claims, which is comprised of: (a) a payment from Rush in the amount of $622,973, which was the remaining contract balance on the Jelke Project after Travelers remedied Krahl's default on the Jelke Project; and (b) a payment from Rush in the amount of $562,713, which represents the combined amount of remaining Bonded Project funds held by Rush for all Rush Bonded Projects excluding the $622,973 payment.

. In light of Travelers' total payments of $2,010,797 to discharge its obligations pursuant to bond claims which have been under the performance and payment bonds it issued on behalf of Krahl for the Rush Bonded Projects, and in light of the combined payments Travelers has

4

received from Rush in the amount of $1,589,622.86 in connection with the payment and performance bond claims from the Rush Bonded Projects, Travelers has sustained a net loss of $421,174.70 on the Rush Bonded Projects.

Travelers has an Agreement with Rush ("Travelers/Rush Indemnity Agreement"), whereby Travelers agreed to indemnify Rush in exchange for certain actions of Rush which agreed to (a) pay Travelers the remaining contract balances on the Rush Bonded Projects in the amount of $562,713; and (b) exercise its common law right of setoff and apply and pay to Travelers the remaining $403,935 in combined Non-Bonded Project funds to the loss and deficit of $421,175.25 existing on the Bonded Projects after Rush and Travelers completed and remedied Krahl's defaults on the Bonded Projects. Rush has paid to Travelers the amounts of: (a) $562,713 in remaining, Bonded Project funds (exclusive of the payment by Rush of the remaining contract balance of $622,973 on the Jelke Project); and (b) the remaining $403,935 in combined Non-Bonded Project funds.

After these payments by Rush to Travelers pursuant to the Travelers/Rush Indemnity Agreement, Rush and Samuels entered into a Stipulation and a Stipulated Judgment filed with the Circuit Court of Cook County on August 11, 2011. By agreement, the enforcement of the stipulated judgment is stayed until this federal litigation is resolved according to the Rush/Samuels Stipulated Judgment.

Travelers intends to hold the contract funds it was paid from Rush to reimburse it for the losses it incurred to discharge its obligations under the performance and payment bonds it issued in connection with the Rush bonded contracts.

**NMH Projects**

Krahl's contract with NMH for the project known as the 676 Outpatient Imaging Center, Project No. 18437, required Krahl to obtain performance and payment bonds, issued by Travelers as Performance Bond No. 105150320, with NMH as Obligee, and Krahl as Principal. Krahl also entered into certain additional contracts with NMH that did not require Krahl to obtain bonds from a surety.

Krahl abandoned work on or failed to complete, and so defaulted on, certain Bonded and Non-Bonded projects for NMH. This included failing to pay subcontractors on both Bonded Projects and Non-Bonded Projects for NMH.

So far Travelers has paid out $1,127,604.00 to discharge its obligations under the performance and payment bonds it issued on the NMH Bonded Project. In connection with the performance bond claim made by NMH on the Bonded Project and Travelers' responding performance, Travelers has received payment from NMH of the remaining Bonded Project contract funds in the amount of $370,889. Applying the $370,889 in remaining NMH Bonded Project contract funds that Travelers has received from NMH against the $1,127,604 paid by Travelers against all performance and payment bond claims made in connection with the NMH Bonded Project, Travelers has sustained a net loss of $756,714 on the NMH Bonded Project.

NMH also possesses contract funds on all Non-Funded Projects involving Krahl as general contractor in the combined amount of $153,707. Travelers made a demand to NMH that NMH exercise and pay to Travelers its common law right of setoff that it has as project owner, against Krahl on projects not bonded by Travelers (NMH Non-Bonded Projects) in order to offset the losses Travelers has incurred on the NMH Bonded Project, and specifically, that net loss of $756,714. As a condition of NMH exercising and assigning its right of setoff as

6

project owner to Travelers, Travelers has in turn offered to indemnify NMH in exchange for NMH tendering any remaining Non-Bonded Contract funds that may have been owed to Krahl subject to NMH's right of setoff, to the deficit that Travelers incurred on an NMH Bonded Project, and specifically, the aforementioned net loss of $756,714.  Unlike Rush, NMH has rejected Travelers' offer and its demand.  Travelers intends to hold any Bonded Contract and Non-Bonded Contract funds it receives from NMH to reimburse it for the losses it incurred to discharge its obligations under the performance and payment bonds it issued in connection with the NMH Bonded Project.

**Applicable Law**

Three separate Loan Agreements of "Revolving Notes" between Krahl and Fifth Third, dated May 1, 2004, November 5, 2008 and June 17, 2009, each contain express, Illinois choice-of-law provisions under the paragraph heading "GOVERNING LAW; CONSENT TO JURISDICTION".  Illinois law otherwise governs the construction contracts entered into between Krahl on the one hand, and Rush and NMH on the other hand. 815 ILCS 665/10.  Because the Bonds issued by Travelers on behalf of Krahl for the Rush and NMH Bonded Projects incorporate those underlying contracts between Krahl on the one hand, and Rush and NMH on the other hand, Illinois law therefore governs the instant dispute between Travelers and Fifth Third Bank. 815 ILCS 665/10. (Ex. 4, ¶ 40).

**The Motion at Hand**

Fifth Third Bank concedes, without much fuss, that Travelers has a superior claim for what it is owed with respect to the Bonded Projects.  It does not concede that this is so with respect to Non-Bonded Receivables.  This is the basis for its cross-claim.

The surety, after performance, acquires the rights of the project owner, here that is Rush and NMH. The right in question is the owner's common law right of setoff. The setoff trumps the contractor's right to funds subject to setoff. Fifth Third possesses the contractor's right to funds subject to setoff.

Travelers contends that, in a case like this, the contractor's right to funds is forfeited because the contractor defaulted and the act of default forfeits rights of a UCC secured creditor. A leading case is *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.,* 411 F.2d 843, 848 (1st Cir. 1969).

In its brief, Travelers relies on a key paragraph in *National Shawmut* which it alters by inserting the names of the actors in this case in replacement of the parties before the First Circuit, to wit:

> Here the payments were earned but unpaid prior to the contractor [Krahl's] default. Prior to default [Krahl] had the right to assign progress payments to [Fifth Third Bank] and had the Bank received payment, it could not … have been divested by the surety [Travelers]. But upon default, the surety [Travelers], which is obligated to complete the work steps into the shoes of the [project owners, NMH or Rush]—not of the contractor [Krahl] which on default has forfeited its rights. [Travelers] is subrogated not only to the right of [NMH or Rush] to pay laborers and materialmen from funds retained out of progress payments … but also to the [project owner's] right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default…. The Massachusetts Supreme Judicial Court has specifically recognized that a mere assignee [like Fifth Third Bank] of a contractor [Krahl] receives the right to moneys due [Krahl] subject, however, to the dominant right of the project owner to recoup damages suffered by default.

In simpler terms, NMH and Rush have rights of setoff superior to those of Krahl. Travelers stands in the shoes of NMH and Rush. Fifth Third stands in the shoes of Krahl. Travelers' rights trump Fifth Third's rights. The cases which establish this rule are not thick on the ground but there are a reasonable number of them and most have been on the books by the end of the 1960s and some are decades older—this is a common indicator that the rule is well established.

8

Fifth Third offers some cases but they are not on point.[1] The Fifth Third cases are distinguishable and subjected to strained and unpersuasive readings. It is not disputed that Travelers did perform its obligation under the performance and payment bonds it issued for both project owners.

The problem for Fifth Third lies in its attempt to recover funds which Krahl owes to it. This cannot succeed if Krahl itself does not have the funds and has no right to the funds. To the extent that the bank argues against a windfall to Travelers, which had nothing to do with the Non-Bonded Projects, it fails because the equitable subrogation rule applies even when the surety does nothing to complete the Non-Bonded Project. If Fifth Third is contending that the equity that underlies subrogation is diluted when the surety does not complete the Non-Bonded Projects, the diluted equity contention fails because it is undisputed that Travelers did pay off on Non-Bonded Projects to close them out.

The fundamental error in Fifth Third's approach is to treat the dispute as one between two claimants' secured interests and/or contractual rights. The surety's claim is based upon the rule of equitable subordination. The surety is not a bank. It does not finance the work of the contractor. If the contractor completes the job without incident, the surety pays nothing and keeps the money it was paid for its bond. Unlike an ordinary insurer, it does not pay off the project owner for the cost and inconvenience of hiring a contractor who goes broke before the job can be completed. The surety must complete the contractor's work. The surety is protected only by its ability to finish the project efficiently which will reduce its loss on the bond. The surety relies on its assessment of the competence of the contractor and on its own ability to

---

[1] E.G. *District of Columbia v. Aetna Ins. Co.,* 462 A.2d 428 (D.C. Cir. 1983), did not involve a competing secured creditor; *Glen Falls Indem. Co. v. American Awning and Tent Co.*, 55 R.I. 284 (R.I. 1935), did not involve payment bonds and the court found this to be a key factor in its rulings; *Merritt Commercial Sav. & Loan, Inc. v. Guinee,* 766 F.2d 850 (4th Cir. 1985), seems to support Travelers.

9

complete the project at a reasonable cost. It does not loan money in exchange for collateral. As the surety notes, "In the case of default the bank takes its security; the surety must go ahead and perform."

If Fifth Third had managed to collect funds from the contractor before default, that is, before the surety became obligated to perform on its bond, the surety cannot claw back the money, but after that obligation was triggered, all funds due to Krahl for work already done are subordinated equitably to the surety. Indeed, for a significant period of time, the bank is in a better position to collect what it is owed from the contractor. Both banks and sureties usually have the right to monitor the progress, performance and solvency of a contractor engaged in construction work. The degree to which either of them do so is left to their discretion. The level of scrutiny varies from project to project and neither party has offered evidence on this point. It is clear that a bank, concerned about repayment of loans, has, in theory at least, a head start on requiring some repayments. From the beginning, the contractor owes money to the bank. Until the contractor fails, the surety has no obligation to perform the contractor's work and no right to collect funds owed to the contractor by the project owner. In this case, the contractor's enterprise came to a sudden demise which, I infer, was a surprise to both bank and surety.

There is no governing precedent in this state. Neither this Court nor our Court of Appeals appears to have issued clear precedent. The precedents relied upon come from many states and more than one circuit. I have found the case of *National Shawmut Bank* persuasive. It is consistent with an underlying policy to protect the interests of the surety on the premise that the social and economic benefits of favoring the interests of the surety in construction projects are substantially greater than those which come from traditional bank loans. Indeed the bank recognizes this in its acceptance of the primacy of the surety on bonded projects. An argument

10

can be made that policy which grants a surety primacy on Non-Bonded Projects ought to be changed but, given long-standing precedent and policy, the change should come from legislation. The security of the surety on construction projects is favored because of the social and economic harm done whenever a large construction project stands incomplete, perhaps dangerous to the public and esthetically revolting, and always serving no useful purpose.

Traveler's motion for partial summary judgment is granted.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: July 8, 2013