| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY CO. OF AMERICA, | |
| Plaintiff, | No. 10 C 406 |
| v. | Judge Thomas M. Durkin |
| JOHN P. PADERTA AND FIFTH THIRD BANK, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Travelers Casualty and Surety Co. of America seeks to have Fifth Third Bank pay it funds deposited in a Fifth Third account, which Fifth Third took to satisfy a loan it made to the account holder. Travelers alleges that it has standing because, pursuant to certain surety and indemnity agreements, it is the equitable subrogee of (a) the account holder, (b) the entities that paid the funds in question to the account holder, and (c) entities that the account holder had an obligation to pay using the funds. Travelers and Fifth Third have cross moved for summary judgment on liability on Counts I (conversion) and II (constructive trust)—i.e., the issue of which of them has priority to the funds. *See* R. 184; R. 187. For the following reasons, Travelers's motion is granted, and Fifth Third's motion is denied.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background[1]

### I.     Krahl & Travelers

Krahl was a general contractor in the business of providing general contracting services for construction projects. R. 185 ¶ 6. The owners of some of the projects Krahl undertook required Krahl to obtain performance surety bonds to guarantee Krahl's performance, including payment of subcontractors, and required the subcontractors to submit lien waivers in order to receive payment from the project owners through Krahl as general contractor. *Id.* ¶ 7. Travelers issued such surety bonds for Krahl. *Id.* ¶¶ 8, 10. To receive surety bonds from Travelers, Krahl also had to enter into a indemnity agreement with Travelers. *Id.* ¶ 11. According to the indemnity agreements, Krahl was required to hold the funds it received from

---

[1] According to the parties' joint statement of facts. R. 185.

project owners in trust. *Id.* ¶ 15. But the agreement does not specifically require Krahl to segregate the funds or otherwise identify them as funds held in trust. *Id.* ¶ 19; *see also id.* ¶¶ 20-22.

At Krahl's request, Travelers issued surety bonds for the following seven projects in Illinois and Colorado relevant to this case: Northwestern Memorial Hospital (Bond 105150320); Rush University Medical Center (Bonds 105150332, 105200157, 105200155, 105268775); Trammell Crow Co. (Bond 105268769); City and County of Denver (Bond 105268766). *Id.* ¶ 23. These seven bonds covered a "combined penal sum" of about $40 million. *Id.* The subcontractors on these projects submitted lien waivers. *Id.* ¶¶ 94, 101, 108, 115, 122, 129, 135.

## II.    Krahl & Fifth Third

Krahl borrowed $6 million from Fifth Third over a period of about five years pursuant to a revolving line of credit. *Id.* ¶ 28. The loan documents provided Fifth Third a security interest in all of Krahl's accounts receivable and proceeds thereof, and in all of Krahl's deposit accounts. *Id.* ¶ 29. The loan documents also defined "Right of Setoff" as follows:

> To the extent permitted under applicable law, [Fifth Third] reserves a right of setoff in all [Krahl's] accounts with [Fifth Third] (whether checking, savings, or some other account). . . . However, this does not include . . . any trust accounts for which setoff would be prohibited by law.

*Id.* ¶ 56.

Krahl also opened a deposit account with Fifth Third. *Id.* ¶ 30. The account was not designated as a trust account, and included no other similar restriction or

designation. *Id.* Krahl regularly made deposits into and withdrawals from this account. *Id.*

### III. Fifth Third's Knowledge of Krahl's Business

Fifth Third considered its loans to Krahl to be "high quality, high performing." *Id.* ¶ 31. Because of the quality of the loans made to Krahl, Krahl was only required to submit "gross numbers and balances on its various projects—the details of each project, information about accounts receivable [and payable]" were not required by Fifth Third. *Id.* Nevertheless, Fifth Third admits that it had documents in its possession showing that some of Krahl's projects required Krahl to obtain surety bonds, and that Travelers had issued such bonds for some of Krahl's projects. *Id.* ¶ 33. For example, Krahl submitted to Fifth Third a document titled, "Request for Credit Commitment," describing Krahl's business and noting that it sometimes was required to obtain surety bonds for its projects, and that the number of projects requiring such bonds was "growing." *Id.* ¶¶ 34-35. Fifth Third's analysis also noted that all five of Krahl's largest accounts were bonded projects. *Id.* ¶¶ 38-39. Additionally, Fifth Third's analysis of Krahl's finances distinguished between bonded and non-bonded accounts receivable, because bonded accounts receivable had "diminished collateral value." *Id.* ¶ 40; *see also id.* ¶¶ 37, 40-42, 58-59. Fifth Third received monthly reports from Krahl regarding its accounts receivable and payable. These reports identified which accounts were bonded and unbonded. These reports were the basis for Krahl to demonstrate a new collateral borrowing base that would enable Krahl to continue to borrow from Fifth Third. *Id.* ¶¶ 78-80.

Matthew Doucet was part of Fifth Third's relationship management team for the Krahl account. *Id.* ¶ 48. Prior to becoming employed by Fifth Third, Doucet worked for surety companies underwriting construction projects. *Id.* ¶¶ 44-46. At his deposition, he testified that he has general knowledge of the business of surety companies and that they obtain indemnity agreements from the principals on the bonds, such as Krahl. *Id.* ¶¶ 51-54. He also testified that he knows that the "intent" of a surety bond is that the general contractor is to "treat" bonded funds as "trust funds." *Id.* ¶ 55.

Doucet testified Fifth Third had quarterly meetings with Krahl, and at those meetings Fifth Third obtained financial statements, account receivable reports, and work in progress reports from Krahl. *Id.* ¶¶ 48-49. Doucet also testified that he would ask Krahl about its surety relationships, and he knew that Krahl had a surety relationship with Travelers. *Id.* ¶¶ 49-50. He testified further, however, that he did not know which projects Travelers had bonded. *Id.* ¶ 50. He testified further that "[i]n the eyes of the bank, we view bonded accounts to be the collateral of the surety company," and that "[i]n the case of those particular surety bonded projects, the surety company has a priority to those funds." *Id.* ¶ 61.

## IV. Krahl in Default

The FBI executed a search warrant on Krahl's offices on January 6, 2010. *Id.* ¶ 69. When Fifth Third inquired about the situation, Krahl informed Fifth Third that as a result of the FBI investigation it would not be pursuing collection of accounts receivable worth approximately $5 million. *Id.* ¶ 70. The next day, on

January 7, Krahl and Fifth Third held a meeting at which Fifth Third asked Krahl to provide a business plan showing that it could maintain profitability. *Id.* ¶ 71. Fifth Third placed a hold on Krahl's accounts in the meantime. *Id.*

Doucet was involved in the meetings with Fifth Third during this time period. He testified that Fifth Third knew that Krahl had pending payments to subcontractors. *Id.* ¶ 77. Krahl did not present a business plan on January 8, leaving it in default on its loans from Fifth Third. *Id.* ¶ 75. That day, Fifth Third took the $3,086,931.05 in Krahl's account. *Id.* ¶ 76. Doucet also testified that, at the time Fifth Third swept Krahl's accounts, he had no knowledge of what deposits in Krahl's account were bonded or not, and he does not believe anyone else at Fifth Third had such knowledge. *Id.* ¶ 82.

Of $3,086,931.05 that was in Krahl's account, $1,829,250.60 were bonded funds received on November 19 and 30, 2009; December 4 and 16, 2009; and January 4 and 6, 2010, from the owners of the seven projects referenced above. *Id.* ¶¶ 87, 91-135. Six of these deposits were checks, and one—the November 19, 2009 deposit—was an Automated Clearing House electronic transfer. *Id.*

### Analysis

Travelers alleges that it has a right to the $1,829,250.60 in bonded funds that were in Krahl's account when Fifth Third swept the account, because Travelers is the subrogee of the beneficiaries of trusts protecting those funds created pursuant to the Illinois Mechanics Lien Act and the Colorado Bond Act. Travelers alleges that claims based on the trusts have priority over Fifth Third's claims based on Krahl's

debt. Fifth Third makes several arguments in opposition: (I) Fifth Third is a "holder in due course," under Article 3 of the Uniform Commercial Code (as codified under Illinois law), and that status "gives Fifth Third priority even over trust funds," R. 188 at 26; (II) Article 4 of the UCC gives Fifth Third the right to take the funds transferred electronically; and (III) the Illinois and Colorado statutes allegedly imposing a trust on Krahl's bonded funds do not "impose liability on lenders," and do not create "express" trusts such that Fifth Third can be said to have "knowledge" giving the trusts priority over Fifth Third as a lender. R. 188 at 22

## I.     Holder In Due Course

Illinois has adopted Article 3 of the Uniform Commercial Code, which provides that in general, "[a] person taking an instrument . . . is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim . . . to recover the instrument or its proceeds." 810 ILCS 5/3-306. By contrast, "a holder in due course takes free of the claim to the instrument." *Id.* Fifth Third argues that it took the six checks at issue in this case as a holder in due course such that it "is not liable to a beneficiary that is otherwise entitled to the proceeds from such instrument[s]," R. 188 at 1, because to the extent any claim on the check proceeds existed when it took hold of the checks, Fifth Third had no actual knowledge of those claims. Travelers argues to the contrary that only constructive knowledge is required to destroy purported holder in due course status, and that Fifth Third had constructive knowledge of the trusts.

The Court will address this debate shortly, but the Court first notes that Fifth Third's argument fails at a much more basic level. The only instruments at issue here are the checks that Krahl received from its project owners drawing on their bank accounts and deposited with Fifth Third. The holder in due course doctrine protects a *holder* of such instruments from claims to the instrument itself or to the right to payment of the proceeds of the instrument (in other words, the right to exchange the instrument for money). But there is no question here that Fifth Third received payment on the checks from the project owners' banks and then credited Krahl's account with the funds it received, such that it no longer held the checks. *See* 5A Anderson U.C.C. § 3-302:20 (3d ed.) ("When a bank has paid a check and returned it to the depositor, the bank cannot claim to be a holder in due course of the check because it is no longer a holder." (citing *Fed. Deposit Ins. Corp. v. West*, 260 S.E.2d 89, 91 (Ga. 1979) ("A drawee bank cannot sue on an instrument as a holder in due course if it does not continue to be a holder."))); 5 Quinn's UCC Commentary & Law Digest § 4-208[A][7] (Rev. 2d ed.) ("[T]he bank no longer had the check in its possession, and the prime requisite for holder-in-due-course status is that you be a holder, that is, a person who is in possession." (citing *Schnitger v. Backus*, 519 P.2d 1315, 1319 (Wa. 1974) ("Possession is a requisite to the status of 'holder in due course'; and therefore following the release of the check . . . , the bank could not claim to be a 'holder in due course' as to another claimant who might come into possession of the reissued check."))); 6 Hawkland UCC Series § 4-209:2 ("Upon

receipt of final settlement for the item, the bank is no longer at risk; its lien, security interest, and its status as holder in due course then terminate.").

No party in this case is challenging Fifth Third's right to have received the proceeds of the checks in the first place. In fact, all parties in this case intended for Fifth Third to take title to the proceeds of the checks. The question here is once the checks cleared and Fifth Third credited Krahl's account, did Fifth Third have the right to take those funds to satisfy Krahl's debts to Fifth Third. This is not an argument over the right to the account funds as proceeds of the checks (to which the holder in due course doctrine would be relevant), but the right to the account funds as between Krahl and Fifth Third each as creditor and debtor (Krahl as creditor of its account and debtor on its loan, and Fifth Third as debtor on the account and creditor on the loan). The holder in due course doctrine is not relevant to this issue.

Even if the holder in due course doctrine was relevant here (which it is not) it would not serve the purpose Fifth Third hopes. Fifth Third argues that as a holder is due course, its claims to the funds in Krahl's account would take priority over all claims except those of which it had *actual knowledge*. But the statute provides otherwise. The holder of an instrument is a holder in due course if the holder took the instrument "without *notice* of any claim to the instrument." 810 ILCS 5/3-302(a)(2)(v). The term "notice" as used in Article 3 is defined according to the general definition provided in Article 1. *See* 810 ILCS 5/3-103(d) ("Article 1 contains general definitions and principles of construction and interpretation applicable throughout this Article [3]."). Accordingly, "a person has 'notice' of a fact if the

9

person: (1) has actual knowledge of it; (2) has received a notice or notification of it; *or* (3) from all the facts and circumstances known to the person at the time in question, has reason to know that it exists." 810 ILCS 5/1-202(a) (emphasis added). Since this definition is stated in the disjunctive, subpart (3) provides that a person with "reason to know" a fact exists has "notice" of that fact. Thus, contrary to Fifth Third's argument, something less than actual knowledge can suffice for notice that destroys holder in due course status.

Despite the clear statutory definition that notice includes constructive knowledge, Fifth Third cites 810 ILCS 5/3-307 in support of its argument that it had to have actual notice of any claim to take priority. *See* R. 188 at 13. That provision applies when

> (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty . . . .

This provision sets forth circumstances when a "represented person" can make a claim on an instrument or proceeds a fiduciary has transferred to a holder. Fifth Third seizes on the provision's requirement of "knowledge" as opposed to "notice," and argues that since it did not have actual knowledge of the statutory trusts, and trusts are a form of fiduciary relationships, Travelers has no right to the funds in Krahl's account pursuant to section 3-307. The problem with this argument is that section 3-307 only applies in circumstances where the person to whom a fiduciary duty is owed (i.e., the "represented person") alleges that the *fiduciary* breached a

duty, and the bank had knowledge of that breach. To the extent that Krahl breached a duty by failing to pay its subcontractors, Travelers's claim in this case is not based on that breach. Rather, it is based on Fifth Third taking funds that would otherwise have been available to Krahl to satisfy its duties. Fifth Third's taking of the account funds does not satisfy the elements of section 3-307, so it is irrelevant here.[2]

## II. Electronic Funds

Of the seven project fund transfers to Krahl at issue, one was an electronic funds transfer. Fifth Third argues that it was permitted to take the funds transferred electronically because under 810 ILCS 5/4A-502(c)(1), "[i]f a beneficiary's bank had received a payment order for payment to the beneficiary's account in the bank . . . [t]he amount credited may be set off against an obligation owed by the beneficiary to the bank." This statute also permits the bank to "credit the beneficiary's account," *id.*, or to satisfy a "levy, attachment, garnishment, notice of lien sequestration, or similar process issued by or on behalf of a creditor or other claimant." 810 ILCS 5/4A502(a). The statute, however, says nothing about the relative priority of competing claims. Travelers does not dispute that Fifth Third had a right to setoff. Rather, Travelers argues that the trust claim for which it is subrogee takes priority over Fifth Third's setoff right. The Court addresses that issue presently.

---

[2] Since the Court finds that section 3-307 is not relevant here, the Court need not address Fifth Third's arguments that the knowledge of its "bank tellers" is relevant to application of section 3-307. *See* R. 188 at 16-17.

## III.    Trust Funds and the Right to Setoff

### A.    Trusts under the Illinois Mechanics Lien Act and the Colorado Bond Act

The Illinois Mechanics Lien Act provides in relevant part:

> (a) *Money held in trust; trustees.* Any owner, contractor, subcontractor, or supplier of any tier who requests or required the execution and delivery of a waiver or mechanics lien by any person who furnishes labor, services, or material . . . for the improvement of a lot or a tract of land in exchange for payment or the promise of a payment, shall hold in trust the unpaid sums subject to the waiver of mechanics lien, as trustee for the person who furnished the labor, services, or material . . . or the person otherwise entitled to payment in exchange for such waiver.

> (b) *How trust moneys held; commingling.* Nothing contained in this Section shall be construed as requiring moneys held in trust by an owner, contractor, subcontractor, or material supplier under this Section to be placed in a separate account. If an owner, contractor, subcontractor, or material supplied commingles moneys held in trust under this Section with other moneys, there mere comingling of the moneys does not constitute a violation of this Section.

770 ILCS 60/21.02.

Similarly, the Colorado Construction Bond Act provides in relevant part:

> (1) All funds disbursed to any contractor or subcontractor under any contract or project subject to the provisions of this article shall be held in trust for the payment of any person that has furnished labor, materials, sustenance, or other supplies used or consumed by the contractor in or about the performance of the work contracted to be done or that supplies laborers, rental machinery, tools, or equipment to the extent used in the prosecution of the work where the person has:

(a) Filed or may filed a verified statement of claim arising from the project; or

(b) Asserted or may assert a claim against a principal or surety under the provisions of this article and for whom or which such disbursement was made.

*　　*　　*　　*

(3) Each contractor or subcontractor shall maintain separate records of account of each project or account; except that nothing in this section shall be construed to require a contractor or subcontractor to deposit trust funds form a single project in a separate bank account solely for that project as long as the trust funds are not disbursed in a manner that conflicts with the requirements of this section.

CRSA 38-26-109.

Fifth Third does not dispute that the elements of these statutes were satisfied for purposes of the seven Krahl projects at issue in this case, such that Krahl was holding funds related to these projects in trust for subcontractors. Fifth Third contends, however, that (1) these statutory trusts do not take priority over its claim to the funds in Krahl's account because the statutes creating the trusts do "not . . . impose liability on lenders" for failing to "hold funds . . . in trust," R. 188 at 22; and (2) the statutes do "not create an express statutory trust that would support Travelers'[s] theory of Fifth Third's 'knowledge' as to the fiduciary nature of the funds," R. 194 at 14 (citing *In re Hivon*, 2015 WL 687124, at *5 (Bankr. N.D. Ill. Feb. 13, 2015)).

As to the first argument, Travelers does not allege that Fifth Third's liability arises from a failure to hold the funds in trust. Rather, Travelers alleges that the

statutory trusts create a claim that is prior to Fifth Third's claimed right to take the funds in Krahl's account as a setoff of Krahl's debt to Fifth Third. Thus, Fifth Third's apparent lack of liability under the relevant Illinois and Colorado statutes is irrelevant to whether the trust relationship created by those statutes affects Fifth Third's right to take the account funds.

Fifth Third's second argument is based on an interpretation of the *Hivon* bankruptcy case. But that case addressed whether the trust created by the Illinois Mechanics Lien Act was sufficient to exempt a debt from discharge under federal bankruptcy law. The court did not question the trust status of funds under the Illinois Act. In fact, the court implicitly recognized the trust status of the funds under Illinois law when it noted that "not all persons treated as fiduciaries under state law are fiduciaries for purposes of [federal bankruptcy law]." *Hivon*, 2015 WL 687124, at *5. *Hivon's* holding that a trust under the Illinois Mechanics Lien Act is insufficient to exempt a certain debt from discharge under federal law is irrelevant to whether such a trust takes priority over a bank's right to setoff, which is the real issue here.

## B.    The Right to Setoff

Under Illinois law, a "bank generally has the right to set off the accounts of its customers in order to satisfy their indebtedness." *Safeco Ins. Co. v. Wheaton Bank and Trust Co.*, 2008 WL 216396, at *3 (N.D. Ill. Jan. 24, 2008) (citing *Gluth Bros. Constr., Inc. v. Union Nat. Bank*, 518 N.E.2d 1345, 1349 (Ill. App. Ct. 2d Dist. 1988) ("The bank may look to deposits on hand to satisfy any indebtedness on the

part of the depositor. This [is the] right of setoff . . . .")); *see also In re Tonyan Const. Co., Inc.*, 28 B.R. 714, 725 (Bankr. N.D. Ill. 1983) ("Ordinarily, where a party deposits funds in a bank, the funds become the property of the bank and the bank becomes the debtor of the depositor. In such a case, there is mutuality of obligation, out of which the bank's right of setoff arises.").

However, "[t]hat right does not extend to situations where the bank has either actual or constructive knowledge that such accounts include trust funds." *Safeco*, 2008 WL 216396, at *3 (citing *Gluth Bros.*, 518 N.E.2d at 1349 ("[W]hen a bank has either actual or constructive notice that the beneficial ownership of an account lies outside the legal title, the bank may not deal with the account's contractual owner to the detriment of the equitable owner." (quoting *In re Estate of Muhammad*, 463 N.E.2d 732, 735 (Ill. App. Ct. 1st Dist. 1984)))); *see also E. Peoria Cmty. High Sch. Dist. No. 309 v. Grand Stage Lighting Co.*, 601 N.E.2d 976, 978 (Ill. App. Ct. 3d Dist. 1992) ("[U]nless money deposited in an account is held in an actual or constructive trust, a bank's knowledge of the derivation of the money does not limit its right of setoff."); *Brandt v. Uptown Nat. Bank of Moline*, 571 N.E.2d 531, 534 (Ill. App. Ct. 3d Dist. 1991) ("The bank may look to deposits on hand to satisfy any indebtedness on the part of the depositor. However, where the depositor holds funds in trust for another party and has deposited such funds in his own account, and the bank knows of the trust, the bank may not set off these funds to satisfy any indebtedness of the depositor.").

Some of the courts to address this principal go further and do not require constructive knowledge, but state that mere inquiry notice that there is an equitable claim to the account funds is sufficient to overcome a bank's right to setoff. *See Tonyan*, 28 B.R. at 725 ("Where, however, a bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of setoff is subject to the rights of such third party."); *see also id.* at 725-26 ("Knowledge that a depositor's business customarily requires the handling of funds in which others have an interest, coupled with other circumstances of equitable cognizance tending to individualize a deposit or line of deposits, may constitute notice of facts sufficient to put the depositary bank upon inquiry as to the true nature of the deposit."); *accord Gluth Bros.*, 518 N.E.2d at 1349; *see also Muhammad*, 463 N.E.2d at 735 ("where [a bank] has notice of the fact that the [account] fund[s] belong[] to another, it may refuse to pay it to the depositor and be compelled to pay it to the real owner. Furthermore, when the issue of equitable ownership arises, relevant evidence may include facts surrounding the creation and history of the account, as well as facts reflecting the intent of the depositor and the source of the funds" (citing *Hanna v. Drovers' Nat. Bank*, 62 N.E. 556 (Ill. 1901); *In re Estate of Cronholm*, 186 N.E.2d 534 (Ill. 1962))).

Whether the relevant standard is "constructive knowledge" or "inquiry notice" is important because the two are not the same. The Seventh Circuit has explained (albeit in a different context) that "constructive knowledge" means

circumstances sufficient for a "reasonably diligent [person to] have discovered" a certain fact existed; whereas "inquiry notice" means "knowledge that would have led a reasonable person to start investigating the possibility" a certain fact existed. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 615 (7th Cir. 2014). The Court need not decide the appropriate standard, however, because as will be explained below, the Court finds that the undisputed facts are sufficient to show that Fifth Third has constructive knowledge that Krahl's account contained trust funds.

Travelers primarily relies on the *Tonyan* and *Gluth* cases in support of its argument that Fifth Third had sufficient knowledge that Krahl's account held trust funds. Fifth Third argues, however, that the banks in those cases had knowledge of facts that amounted to actual knowledge of the equitable claims on the account funds at issue in those cases. Fifth Third contends that its knowledge of Krahl's business and the character of the funds in its account is not so great as that of the banks in those cases, and thus those cases do not suggest a finding of liability in this case.

The *Tonyan* case did not address the Illinois Mechanics Lien Act, but concerned analogous circumstances of a general contractor depositing funds in a bank account after the funds had been transferred to the general contractor by the owner of a construction project for the "special purpose" of paying subcontractors. 28 B.R. at 725. On this basis, the court "impressed a trust . . . upon the funds" at issue and held that the trust took priority over the bank's right to setoff the general

contractor's debt. *Id.* The court reached this conclusion after holding a hearing at which the relevant bank employees testified. The court held that the bank was on inquiry notice regarding the subcontractors' claims to the funds based on the following facts: "over the years, the Bank maintained close scrutiny of [the general contractor's] affairs, reviewing periodic financial statements, and holding meetings at which [the general contractor's] business affairs and financial condition were discussed"; additionally, in one prior instance, the bank held certain funds "in escrow to satisfy the disputed claims of certain subcontractors." *Id.* at 726.

In *Gluth*, a contractor was party to a project governed by a joint venture agreement providing that "[a]ll monies contributed by the parties to this Joint Venture and all monies received as payment under the Construction Contract are hereby designated as trust funds." 518 N.E.2d at 1347. The joint venture wrote a check to the contractor, which the contractor deposited in its bank account, and the bank subsequently took in setoff of the contractor's debt to the bank. At trial, the bank's president testified:

> that he knew [the contractor's owner], who had been a customer of the bank for some time. He discussed the . . . project with [the contractor's owner], received a request for funds for the project from [the contractor's owner] and received documents for consideration from [the contractor's owner]. [The bank's president] knew about the joint venture . . . .
>
> [The bank's president] testified that he received a copy of the joint venture agreement prior to approval of the loan. He also accepted a copy of the joint venture agreement to open up the joint venture checking account in April 1981. At his request, [a provision] was eliminated from the joint venture agreement . . . .

> [The bank's president] never asked that paragraph seven
> concerning trust funds be eliminated from the joint
> venture agreement.

*Id.* at 1348. On appeal the court held that these facts supported the verdict against the bank.

In both *Tonyan* and *Gluth*, the courts found after evidentiary hearings that the banks had detailed knowledge of the specific construction projects giving rise to claims to the funds in the depositors' accounts. Fifth Third argues that the undisputed evidence in this case does not rise to that level. The Court agrees with that assessment, but disagrees that such specific knowledge is required to impose liability on a bank in these circumstances. Rather, as discussed, constructive knowledge—i.e., facts sufficient for a reasonably diligent person to have gained actual knowledge— is sufficient. And the Court holds that no reasonable jury could find that Fifth Third did not have constructive knowledge that there were equitable trust claims to the funds in Krahl's account. There is no dispute that Fifth Third knew that much of Krahl's business required surety bonds. It is also undisputed that Fifth Third was aware which of Krahl's projects were bonded because that fact was relevant to Fifth Third's determination of the collateral base for Krahl's credit with the bank. Fifth Third met with the Krahl quarterly, and received monthly reports from Krahl to enable Fifth Third to monitor Krahl's credit-worthiness and to adjust its credit limit. It is possible that when Fifth Third took the funds in Krahl's account it did not know specifically how much of those funds were bonded. But Krahl knew that some of the funds were bonded because it received monthly reports

with this information, and it used this information to adjust Krahl's credit. To the extent Fifth Third did not have knowledge at the level of specificity of the banks in *Tonyan* and *Gluth*, that was only because Fifth Third chose not to appreciate the information that was readily available to it. The undisputed facts show that Fifth Third knew that Krahl's account almost certainly contained trust funds, and that Fifth Third could have identified the trust funds with reasonable diligence. This evidence is sufficient to grant summary judgment on liability in Traveler's favor.

*    *    *    *

In sum, the Court holds that Fifth Third wrongfully took the trust funds in Krahl's account, and that the wrongful nature of that action satisfies the elements of claims for conversion and constructive trust under Illinois law. *See Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998) ("To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property."); *Suttles v. Vogel*, 533 N.E.2d 901, 904 (Ill. 1988) ("A constructive trust is created when a court declares the party in possession of wrongfully acquired property as the constructive trustee of that property, because it would be inequitable for that party to retain possession of the property."). Additionally, the Court finds that the evidence showing that Fifth Third had constructive knowledge that Krahl's account contained trust funds is clear and convincing such that imposition of a constructive trust is warranted. *See*

*Suttles*, 533 N.E.2d at 905 ("[T]he grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion"); *Gluth Bros.*, 518 N.E.2d at 1350 ("Because the gravamen of the complaint in the present case is that defendant wrongfully appropriated money in which plaintiffs had an interest, imposition of a constructive trust would be the proper remedy. This being the case, . . . the trial court was thus required to apply a clear and convincing standard of proof."). Therefore, summary judgment in Travelers favor is granted on Counts I and II of its complaint.

## Conclusion

For the foregoing reasons, Travelers's motion for summary judgment on liability on Counts I and II, R. 184, is granted, and Fifth Third's motion for summary judgment on liability on those Counts, R. 187, is denied. A status hearing is set for Friday, April 13, 2018, at which the parties should be prepared to discuss whether and how (1) the remaining Counts III (breach of contract) and IV (implied contractual indemnity) should be addressed; and (2) the damages phase of the case should proceed.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 29, 2018